**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**
**SOUTHWESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>APPROXIMATELY 15.17 ACRES IN NEWTON COUNTY, MISSOURI, ALSO KNOWN AS TRACTS 1, 2, 3, 10 AND 11 OF THE HAUNTED SPRINGS ESTATES SURVEY DATED JANUARY 23, 2023, ALONG WITH ALL ITS BUILDINGS, APPURTENANCES, AND IMPROVEMENTS,<br><br>and,<br><br>REAL PROPERTY DESCRIBED AS ALL THAT PART OF GOVERNMENT LOT 3 OF FRACTIONAL SECTION 9, TOWNSHIP 27 NORTH, RANGE 25 EAST, OTTAWA COUNTY, OKLAHOMA, ALONG WITH ALL ITS BUILDINGS, APPURTENANCES, AND IMPROVEMENTS,<br><br>Defendants. | Case No. 26- 05052-CV-SW- |

## COMPLAINT FOR FORFEITURE IN REM

Plaintiff, United States of America, by its attorneys, R. Matthew Price, United States Attorney for the Western District of Missouri, and Anthony M. Brown, Assistant United States Attorney, brings this complaint and alleges as follows in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure:

## NATURE OF THE ACTION

1. This is an action to forfeit property to the United States for violations of 18 U.S.C. §§ 981(a)(1)(A) and (a)(1)(C).

**THE DEFENDANTS IN REM**

2. The Defendant Properties consist of the following real properties:

a. 15.17 acres in Newton County, Missouri ("15.17 Acres") more thoroughly

described as:

ALL THAT PART OF THE NORTHWEST QUARTER (NW1/4) OF THE SOUTHEAST QUARTER (SE1/4) OF SECTION 10, TOWNSHIP 24, RANGE 34, NEWTON COUNTY, MISSOURI, DESCRIBED AS FOLLOWS:

BEGINNING AT A SET IRON PIN AND CAP AT THE NORTHEAST CORNER OF SAID NORTHWEST QUARTER OF THE SOUTHEAST QUARTER; THENCE N87°47'36"W ALONG THE NORTH LINE OF SAID NORTHWEST QUARTER OF THE SOUTHEAST QUARTER, A DISTANCE OF 521.90 FEET; THENCE S00°00'00"E, A DISTANCE OF 451.59 FEET; THENCE N34°43'47"E, A DISTANCE OF 200.48 FEET; THENCE N78°05'28"E, A DISTANCE OF 408.67 FEET TO A POINT ON THE EAST LINE OF SAID NORTHWEST QUARTER OF THE SOUTHEAST QUARTER; THENCE N02°19'54"E ALONG SAID EAST LINE, A DISTANCE OF 182.55 FEET TO THE POINT OF BEGINNING.

ALSO KNOWN AS TRACT 1 OF THE HAUNTED SPRINGS ESTATES SURVEY DATED JANUARY 23, 2023, BY MJSURVEYING, LLC, REFERENCED AS PROJECT #22255.

ALSO ALL THAT PART OF THE NORTHWEST QUARTER (NW1/4) OF THE SOUTHEAST QUARTER (SE1/4) OF SECTION 10, TOWNSHIP 24, RANGE 34, NEWTON COUNTY, MISSOURI, DESCRIBED AS FOLLOWS:

COMMENCING AT A FOUND PIPE AT THE NORTHWEST CORNER OF SAID NORTHWEST QUARTER OF THE SOUTHEAST QUARTER; THENCE S87°47'36"E ALONG THE NORTH LINE OF SAID NORTHWEST QUARTER OF THE SOUTHEAST QUARTER, A DISTANCE OF 536.29 FEET TO THE POINT OF BEGINNING; THENCE CONTINUING S87°47'36"E, A DISTANCE OF 248.11 FEET; THENCE S00°00'00"E, A DISTANCE OF 451.59 FEET; THENCE S34°43'47"W, A DISTANCE OF 124.69 FEET; THENCE S71°29'45"W, A DISTANCE OF 186.53 FEET; THENCE N00°00'00"E, A DISTANCE OF 622.82 FEET TO THE POINT OF BEGINNING.

ALSO KNOWN AS TRACT 2 OF THE HAUNTED SPRINGS ESTATES SURVEY DATED JANUARY 23, 2023, BY MJSURVEYING, LLC, REFERENCED AS PROJECT #22255.

ALSO ALL THAT PART OF THE NORTHWEST QUARTER (NW1/4) OF THE SOUTHEAST QUARTER (SE1/4) OF SECTION 10, TOWNSHIP 24, RANGE 34, NEWTON COUNTY, MISSOURI, DESCRIBED AS FOLLOWS:

COMMENCING AT A FOUND PIPE AT THE NORTHWEST CORNER OF SAID NORTHWEST QUARTER OF THE SOUTHEAST QUARTER; THENCE N87°47'36"E ALONG THE NORTH LINE OF SAID NORTHWEST QUARTER OF THE SOUTHEAST QUARTER, A DISTANCE OF 217.70 FEET TO THE POINT OF BEGINNING; THENCE CONTINUING N87°47'36"W, A DISTANCE OF 318.59 FEET; THENCE S00°00'00"E, A DISTANCE OF 622.82 FEET; THENCE S71°29'45"W, A DISTANCE OF 112.02 FEET; THENCE N17°33'08"W, A DISTANCE OF 703.38 FEET TO THE POINT OF BEGINNING.

ALSO KNOWN AS TRACT 3 OF THE HAUNTED SPRINGS ESTATES SURVEY DATED JANUARY 23, 2023, BY MJSURVEYING, LLC, REFERENCED AS PROJECT #22255.

ALSO ALL THAT PART OF THE NORTHWEST QUARTER (NW1/4) OF THE SOUTHEAST QUARTER (SE1/4) OF SECTION 10, TOWNSHIP 24, RANGE 34, NEWTON COUNTY, MISSOURI, DESCRIBED AS FOLLOWS:

BEGINNING AT A SET IRON PIN AND CAP AT THE SOUTHEAST CORNER OF SAID NORTHWEST QUARTER OF THE SOUTHEAST QUARTER; N02°19'54"E ALONG THE EAST LINE OF SAID NORTHWEST QUARTER OF THE SOUTHEAST QUARTER, A DISTANCE OF 482.47 FEET TO THE POINT OF BEGINNING; THENCE N88°31'12"W, A DISTANCE OF 290.69 FEET; THENCE N07°13'18"W, A DISTANCE OF 565.36 FEET; THENCE N78°05'28"E, A DISTANCE OF 396.68 FEET TO A POINT ON THE EAST LINE OF SAID NORTHWEST QUARTER OF THE SOUTHEAST QUARTER; THENCE S02°19'54"W ALONG SAID EAST LINE, A DISTANCE OF 650.78 FEET TO THE POINT OF BEGINNING.

ALSO KNOWN AS TRACT 10 OF THE HAUNTED SPRINGS ESTATES SURVEY DATED JANUARY 23, 2023, BY MJSURVEYING, LLC, REFERENCED AS PROJECT #22255.

3

ALSO ALL THAT PART OF THE NORTHWEST QUARTER (NW1/4) OF THE SOUTHEAST QUARTER (SE1/4) OF SECTION 10, TOWNSHIP 24, RANGE 34, NEWTON COUNTY, MISSOURI, DESCRIBED AS FOLLOWS:

BEGINNING AT A SET IRON PIN AND CAP AT THE SOUTHEAST CORNER OF SAID NORTHWEST QUARTER OF THE SOUTHEAST QUARTER; N02°19'54"E ALONG THE EAST LINE OF SAID NORTHWEST QUARTER OF THE SOUTHEAST QUARTER, A DISTANCE OF 482.47 FEET; THENCE N88°31'12"W, A DISTANCE OF 290.69 FEET TO THE POINT OF BEGINNING; THENCE CONTINUING N88°31'12"W, A DISTANCE OF 597.05 FEET; THENCE N09°47'34"E, A DISTANCE OF 178.46 FEET; THENCE N71°29'45"E, A DISTANCE OF 314.72 FEET; THENCE N34°43'47"E, A DISTANCE OF 325.17 FEET; THENCE N78°05'28"E, A DISTANCE OF 11.99 FEET; THENCE S07°13'18"E, A DISTANCE OF 565.36 FEET TO THE POINT OF BEGINNING.

ALSO KNOWN AS TRACT 11 OF THE HAUNTED SPRINGS ESTATES SURVEY DATED JANUARY 23, 2023, BY MJSURVEYING, LLC, REFERENCED AS PROJECT #22255.

ALL OF THE ABOVE DESCRIBED TRACTS ARE TOGETHER WITH AND SUBJECT TO A FIFTY FOOT (50') INGRESS, EGRESS EASEMENT LYING IN THE NORTHWEST QUARTER (NW1/4) OF THE SOUTHEAST QUARTER (SE1/4) OF SECTION 10, TOWNSHIP 24, RANGE 34, NEWTON COUNTY, MISSOURI, DESCRIBED AS FOLLOWS:

BEGINNING AT A SET IRON PIN AND CAP AT THE SOUTHEAST CORNER OF SAID NORTHWEST QUARTER OF THE SOUTHEAST QUARTER; THENCE N87°50'41"W, A DISTANCE OF 837.20 FEET; THENCE N20°22'36"W, A DISTANCE OF 271.19 FEET; THENCE N09°47'34"E, A DISTANCE OF 388.73 FEET TO A NON-TANGENT CURVE TO THE RIGHT, HAVING A RADIUS OF 30.00 FEET AND A CHORD BEARING AND DISTANCE OF N40°38'39"E, 54.11 FEET; THENCE ALONG SAID CURVE TO THE RIGHT, AN ARC DISTANCE OF 67.45 FEET; THENCE N71°29'45"E, A DISTANCE OF 289.83 FEET; THENCE N34°43'47"E, A DISTANCE OF 326.80 FEET; THENCE N78°05'28"E, A DISTANCE OF 181.15 FEET TO A NON-TANGENT CURVE TO THE RIGHT, HAVING A RADIUS OF 50.00 FEET AND A CHORD BEARING AND DISTANCE OF S11°54'32"E, 50.00 FEET; THENCE ALONG SAID CURVE TO THE RIGHT, AN ARC DISTANCE OF 261.80 FEET; THENCE S78°05'28"W, A DISTANCE OF 161.27 FEET; THENCE S34°43'47"W, A DISTANCE OF 323.54 FEET; THENCE

4

S71°29'45"W, A DISTANCE OF 308.09 FEET; THENCE S09°47'34"W, A DISTANCE OF 376.90 FEET; THENCE S20°22'36"E, A DISTANCE OF 224.33 FEET; THENCE S87°50'41"E, A DISTANCE OF 803.97 FEET TO A POINT ON THE EAST LINE OF SAID NORTHWEST QUARTER OF THE SOUTHEAST QUARTER; THENCE S02°19'54"W, ALONG SAID EAST LINE, A DISTANCE OF 50.00 FEET TO THE POINT OF BEGINNING.

ALSO KNOWN AS INGRESS/EGRESS EASEMENT #1 OF THE HAUNTED SPRINGS ESTATES SURVEY DATED JANUARY 23, 2023, BY MJSURVEYING, LLC, REFERENCED AS PROJECT #22255.

b. Real Property in Wyandotte, Oklahoma ("Wyandotte Property"), more thoroughly described as:

All that part of Government Lot 3 of Fractional Section 9, Township 27 North, Range 25 East, Ottawa County, Oklahoma, described as follows:

Commencing at a found iron pin at the Northeast corner of said Lot 3; Thence South 00° 01' 07" West along the East line of said Lot 3, said East line being the common line between Oklahoma and Missouri, 614.56 feet to a found axle; Thence South 00° 09' 27" West along said East line 10.43 feet to the Point of Beginning;

Thence continuing South 00° 09' 27" West, 110.55 feet; Thence South 50° 11' 34" West, 315.73 feet; Thence North 45° 26' 05" West, 220.00 feet to a point on a non-tangent curve to the right having a radius of 1829.86 feet and a chord bearing a distance of North 51° 14' 33" East, 425.54 feet, said point begin on the Southerly right-of-way line of Oklahoma East Highway 60; Thence along said non-tangent curve an arc distance of 426.50 feet; Thence South 32° 04' 49" East, 127.57 feet to the Point of Beginning.

The recorded owner of defendant 15.17 Acres is Blome Properties, LLC. The registered agent of Blome Properties, LLC is Jason Huston. The recorded owners of defendant Wyandotte Property are Casey R. Crider and Jason Huston.

3. The Defendant Properties have not been seized but are located within the jurisdiction of the Court as described below. The United States will, as provided by 18 U.S.C. § 985(b)(1) and (c)(1), post notice of this action and a copy of the Complaint on the Defendant Properties and serve notice of this action on the Defendant Properties owners, and any other person

5

or entity who may claim an interest in the Defendant Properties, along with a copy of this Complaint. The United States may elect to file Lis Pendens as to the Defendant Properties at any time.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a). This Court also has jurisdiction over this particular action under 18 U.S.C. §§ 981(a)(1)(A) and (a)(1)(C).

5. This Court has *in rem* jurisdiction over the entirety of the Defendant Properties pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this district; pursuant to 28 U.S.C. § 1355(b)(1)(B), incorporating 28 U.S.C. § 1395, because the action accrued in this district and the Defendant Properties in Missouri are found in this district.

6. Venue is proper in this district pursuant to 28 U.S.C. §1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in the Western District of Missouri, and pursuant to 28 U.S.C. § 1395, as to Defendant Properties in Missouri because the action accrued in this district and the defendant is found in this district.

## BASIS FOR FORFEITURE

7. The Defendant Properties are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because they constitute property involved in transactions or in attempted transactions in violation of 18 U.S.C. §§ 1956 and/or 1957 or are properties traceable to such property.

6

8.      The Defendant Properties are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), because they constitute or are derived from proceeds traceable to an offense constituting a Specified Unlawful Activity ("SUA") as defined in section 1956(c)(7) and 1961(1) of Title 18, United States Code, or a conspiracy to commit such an offense. Such offenses include, but are not limited to, violations of 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud).

## THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

9.      The United States Food and Drug Administration ("FDA") is the federal agency charged with responsibility of protecting the health and safety of the American public by enforcing the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301–399i. One of the purposes of the FDCA is to ensure that drugs sold for human use are safe and effective for their intended use and bear labeling that contains true and accurate information.

10.     The FDCA defines a "drug" under 21 U.S.C. § 321(g) as:

> (A) articles recognized in the official United States Pharmacopoeia, official Homeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (C) articles (other than food) intended to affect the structure or any function of the body of man or other animals; and articles intended to use as a component of any articles specified above.

11.     The FDCA defines "prescription drugs" as drugs that, because of their toxicity and other potential for harmful effects, or the method of their use, or the collateral measures necessary to their use, are not safe for use except under the supervision of a practitioner licensed by law to administer such drugs. 21 U.S.C. § 353(b)(1)(A). A drug is also a prescription drug if the FDA requires it to be administered under the supervision of a practitioner licensed by law to administer such drug as a condition of the FDA's approval of the drug. 21 U.S.C. § 353(b)(1)(B).

7

12. The act of dispensing a prescription drug without a valid prescription from a practitioner licensed by law to administer such a drug is an act that results in the drug being misbranded while held for sale. See 21 U.S.C. § 353(b)(1).

13. The FDCA makes it a crime to introduce or deliver for introduction, or cause the introduction or delivery, into interstate commerce, of any drug that is misbranded. See 21 U.S.C. § 331(a).

14. A misbranded drug is one in which the labeling is false or misleading, or fails to meet specific regulatory requirements for packaging, ingredients, and warnings. See 21 U.S.C. § 352.

15. Further, the FDCA does not permit the introduction or delivery for introduction into interstate commerce a "new drug" unless it has been approved by the FDA. A "new drug" cannot be lawfully introduced or delivered for introduction into interstate commerce unless the FDA has approved a New Drug Application ("NDA") or an Abbreviated New Drug Application ("ANDA") with respect to such drug, or such drug was exempted from approval pursuant to an effective Investigational New Drug Application ("IND"). 21 U.S.C. §§ 331(d) and 335 (a), (b), (i), and (j). Under the FDCA, a "new drug" is any drug "the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof . . . ." 21 U.S.C. § 321(p)(1).

16. The FDCA imposes strict-liability misdemeanor punishment for violations of 21 U.S.C. § 331. The FDCA imposes felony punishment of up to three years of imprisonment and/or

8

a fine for conduct committed with an "intent to defraud or mislead" either consumers or government regulators. 21 U.S.C. § 333(a)(2).

<u>**BACKGROUND OF INVESTIGATION**</u>

17.     In June 2025, federal agents began investigating Jason Huston ("Huston") and Casey Crider ("Crider") d/b/a Blome Research, LLC ("Blome Research") regarding the sale of unlicensed weight loss drugs, including "semaglutide," "tirzepatide," and "retatrutide" ("peptides") on a website operated by them.

18.     In approximately September 2024, the Missouri Board of Pharmacy ("MBP") was provided with screenshots from Crider's Facebook page and a Facebook Messenger chat with a pharmacist where Crider offered to sell tirzepatide for weight loss, if the pharmacist was "not the FDA."

19.     On September 24, 2024, an employee with MBP acting in an undercover capacity emailed Blome Research at an address provided on the website to inquire about the source of the products being offered for sale.

20.     The responding party advised that, "[i]t all comes made and done from the factory," and "[i]t's in china, I just know they come here and we 3rd party test them at a lab in CA and the lab sends us a report for purity and it is 100% pure."

21.     On October 23, 2024, the MBP placed an undercover order with Blome Research for four vials of semaglutide. On October 30, 2024, MBP placed an undercover order with Blome Research for three vials of bacteriostatic water, a substance used to mix the semaglutide. The two items were sent via United States Postal Service ("USPS") Priority Mail, displaying Blome Research, 103 Briar Meadow Drive, Carl Junction, Missouri 64834 as the return shipping address.

22. The MBP issued a cease-and-desist letter to Blome Research on November 1, 2024, requesting that they discontinue the unlicensed practice of pharmacy within the state of Missouri and drug distributorship, and Blome Research acknowledged receipt of the letter, agreeing to stop all business as of the receipt date.

23. Neither Crider nor Huston is a licensed Medical Doctor or Doctor of Pharmacy. Further, no known employees at Blome Research are licensed Medical Doctors or Doctors of Pharmacy.

24. On July 30, 2025, federal agents accessed the website operated by Blome Research and found a new landing page, stating "Blome Research" and "Due to New Regulations We have had to make some changes to the names of a couple of products," which were listed as "GLP-Tir = Tirz," "GLP-Sem = Sema," and "GLP-Ret = Reta."

25. Additionally, federal agents observed that the website now required users to click on a button labeled "I understand" following a disclaimer which read: "OUR PRODUCTS ARE NOT DIETARY SUPPLEMENTS OR MEDICATIONS. BY PURCHASING THEM YOU AGREE TO USE THEM IN A LEGAL MANNER. IT IS YOUR RESPONSIBILITY TO KNOW WHAT THAT IS."

26. Upon hitting "I understand," the home page of the website showed vials bearing labels for various drugs, pictured next to their sale price, including "Semaglutide," "Retatrutide,"[1] "Tirz," and "reconstitution solution," among others.

---

[1] Retatrutide is a weight-loss drug that is not FDA approved, and there are no FDA-approved drugs containing Retatrutide as an active ingredient.

27. A federal agent reviewed the website's profile for retatrutide, priced at $200.00 for a 20mg vial, which included disclaimers for "NOT FOR HUMAN USE" and "RESEARCH PURPOSES ONLY" below the product header.

28. Investigators determined that the phone numbers listed on the Blome Research website belonged to Huston and Crider and the address on the return label was the residence of Huston.

29. Inquiries of the FDA's list of current new drug applications ("NDA") showed no approved NDAs for Blome Research, and thus, Blome Research was not permitted to offer retratruide or any other new drug.

30. Between January 4, 2024, through September 8, 2025, Huston, Crider, and Blome Research shipped approximately 31,776 parcels from Carl Junction, Joplin, and Seneca, Missouri, utilizing postage purchased from an online provider.

31. Postal business records determined that a large portion of these parcels entered the mail stream at the known residence of Huston, where they received their initial acceptance scan when a mail carrier picked up the packages from the residence.

32. In mid to late 2025, search warrants executed by federal agents on packages shipped from Blome Research revealed misbranded pharmaceuticals offered for sale on their website, including semaglutide, retratruide, and tirzepatide.

33. On November 24, 2025, an officer acting in an undercover capacity ("UCA1") made a recorded telephone call to Crider.

11

34. UCA1 told Crider that UCA1 was trying to lose some weight and asked for suggestions. Crider responded by telling UCA1 retatrutide would be the best option for UCA1 to use and explained that a lot of people are starting to use retatrutide.

35. During the phone call, Crider stated that he was "not supposed to give this information because we're not pharmacists or doctors," but that he lost 100 pounds in 11 months with the "same stuff we sell." Crider then went into detail describing dosing rates for UCA1 and provided instructions on what needles to use.

36. On February 24, 2026, a federal agent, acting in an undercover capacity ("UCA2"), placed an order for one vial of TIRZ 20 from the Blome Research website for $80.00 and an additional $13.00 for shipping, without providing a prescription, providing an address within the District of Kansas for receipt.

37. UCA2 received a package at a location in the District of Kansas, shipped via USPS Priority Mail, which had been introduced into the mail stream when it was picked up by a USPS carrier at Huston's known residence.

38. Inside the parcel received by UCA2, there was one vial labeled "TIRZ 20," and a packing slip referencing UCA2's order number; no use instructions or warnings were included.

39. On Friday, March 13, 2026, UCA2 called Huston to discuss the previous order and the potential for shipping peptides internationally.

40. Huston stated that he could not legally give advice on how to use the product, but then stated it was perfectly clear for personal use and provided instructions on how to use the product for weight loss purposes.

41. Huston stated he was hesitant to ship internationally because Blome Research was on a "watch list," and that if UCA2 needed the product shipped internationally, the only option would be an electronic money transfer through Zelle or by check, as the website was not set up to take international orders.

42. Huston also advised that Blome Research can arrange "porch pick ups" for people willing to drive to Seneca, Missouri to avoid shipping costs.

**Mail Fraud**

43. Between July 2023 through present, Huston, Crider, and Blome Research have used the mail in part of a scheme to obtain money and property by means of false pretenses, representations, and promises.

44. The products Huston, Crider, and Blome Research sold are "drugs" under the FDCA, because they are intended to affect the structure and function of the body, despite labeling them as being for "research purposes." See 21 U.S.C. § 321(g)(1).

45. The products Huston, Crider, and Blome Research sold are misbranded, as their labels bore false and misleading branding, stating the products were for research purposes only, yet instructing consumers how to use them to affect the structure and function of the body.

46. Huston, Crider, and Blome Research used the internet to advertise and sell these misbranded drugs through interstate wires.

**Financial Analysis**

47. During the investigation, federal agents obtained a large volume of bank, business, and financial records of accounts owned by Huston, Crider, and Blome Research, finding at least 50 bank accounts owned or controlled by Huston, Crider, and/or Blome Research.

13

48. Among these accounts are Bluevine Inc. account number x6214 ("Bluevine x6214"), in the name of Blome Research, with an address associated with Jason Huston; U.S. Bank account number x9995 ("US Bank x9995"), in the name of Huston, with an address associated with Jason Huston; US Bank account number x8547 ("US Bank x8547"), in the name of Huston, Bank of America account number x2564 ("BOA x2564") in the name of Blome Research, both with an address associated with Jason Huston; and Arvest Bank account number x9359 ("Arvest x9359") in the name of Crider, with an address associated with Crider, all of which are accounts held at financial institutions.

49. Beginning in approximately May of 2023, Huston and Crider, d/b/a Blome Research, began making numerous large purchases from online chemical companies advertised as being located in the People's Republic of China ("PRC").

50. Between June 2023 and November 2023, numerous international wire debit transfers between accounts associated with Blome Research to companies associated with chemical sales in the PRC, totaling over $1 million, were located coming out of Bluevine x6214, US Bank x9995, and BOA x2564.

51. From additional analysis of their bank accounts, numerous regular and routine deposits into accounts owned and controlled by Huston, Crider, and Blome Research were located for the sale of weight loss peptides listed for sale on their website, with many of the deposits referencing "blome," "order," "research," "tirzepatide," "tirz," "peptides," "meds," "sema," "semaglutide," and other similarly related references.

52. Huston, Crider, and Blome Research maintained approximately 12 different "intake" accounts in which they would receive funds from buyers of illegal peptides, including

14

four PayPal accounts, three CashApp accounts, two Zelle accounts, two MetaPay accounts, and Bluevine x6214.

53. Huston and Crider also accepted personal checks from customers for the sale of weight loss peptides, with the memos of said checks oftentimes listing, "med," "medication," "medical supplies," "blome," "order," "peptide," or sometimes the name of the peptide the customer was paying for, which were deposited in the aforementioned "intake" accounts.

54. According to financial records, Huston and Crider last had income from legitimate sources in approximately November 2023 and May 2024, in the amounts of $4,334.06 and $2,303.04 respectively.

55. Between July 2023 and December 2025, Huston, Crider, and Blome Research accepted approximately $15 million into various bank accounts they owned and controlled, primarily from the sales of illegal misbranded peptides.

56. Huston and Crider would then transfer the sales proceeds into bank accounts they owned and controlled to make personal purchases.

57. Among (but not limited to) these accounts are the aforementioned US Bank x9995 account; U.S. Bank account number x8596 ("US Bank x8596"), in the name of Huston, with an address associated with Huston; Bank of America account number x8285 ("BOA x8285") in the name of Huston, with an address associated with Huston; Arvest Bank account number x5074 ("Arvest x5074") in the name of Huston, with an address associated with Huston; the aforementioned Arvest x9359 account; and Arvest Bank account number x3253 ("Arvest x3253") in the name of Crider, with an address associated with Crider, all of which are accounts held at financial institutions.

15

<u>15.17 Acres</u>

58.     On or about July 18, 2024, Huston formed Blome Properties, LLC with the state of Missouri listing its purpose as "Land Development, Housing rentals." Per the Newton County, Missouri Collector's Office, Blome Properties, LLC shows a mailing address of the known residence of Jason Huston.

59.     On or about March 5, 2025, Huston purchased US Bank cashier's check number 8227509998 made payable to Apex Title & Closing Services in the amount of $84,330.51 using funds drawn from his US Bank account ending x8596, towards the purchase of defendant 15.17 Acres.

60.     Also, on or about March 5, 2025, Crider purchased Arvest Bank cashier's check number 7600010139 made payable to Apex Title & Closing Service LLC in the amount of $84,330.51 using funds drawn from his Arvest account ending x3253, again towards the purchase of defendant 15.17 Acres.

<u>Wyandotte Property</u>

61.     On or about April 23, 2025, defendant Wyandotte Property was purchased by Casey Crider and Jason Huston from Elmcreek Properties, LLC for $37,500.

62.     The Warranty Deed for this property was mailed to the known residence of Jason Huston.

63.     Currently situated on the defendant property sits the business, Stateline Welding and Fabrication, which is operated by Trenton Wilson.

16

64. On June 4, 2026, Shyann Wilson was interviewed by federal investigators. During her interview, Shyann Wilson reported that in January of 2025, the Wilsons approached Huston to ask if he would be interested in financing their welding and fabrication business.

65. Huston and Crider indicated that they would be interested in financing the Wilsons' business.

66. It was agreed that Huston and Crider would finance the Wilsons' business, while Trenton Wilson would supply the knowledge, experience, and expertise, along with some tools and equipment.

67. In April of 2025, the Wilsons engaged a lawyer to draw up an agreement which was later finalized in January or February of 2026.

68. Shyann Wilson advised federal investigators that Huston and Crider paid a total of $1.1 million to fund the business which was split between them evenly.

69. Shyann Wilson advised the land for the business was purchased first for $20,000 to $30,000, and an individual was paid for the concrete work for the shop which amounted to $30,000 to $40,000.

70. Shyann Wilson estimated the shop building cost approximately $200,000 which was purchased from Midland Steel on 43 Highway near Seneca, Missouri.

71. According to Shaynn Wilson's statement to federal investigators, in March or April of 2025, Huston and Crider also purchased two trucks for the business, and that these vehicles were included in the $1.1 million that the Wilsons would owe Huston and Crider.

17

72. The Wilsons knew Huston and Crider made their money from the sale of peptides designed for weight loss when they first approached the two about financing their business, as they admitted to federal investigators to purchasing peptides from Huston and Crider.

73. A review of bank records obtained during the ongoing investigation revealed that on or about March 31, 2025, Huston wrote check number 222 in the amount of $500 payable to Grand River Abstract & Title with a memo of "Earnest $" from US Bank account ending x9995.

74. Further, Huston and Crider made payments towards improving the defendant property as further detailed below.

75. On or about April 7, 2025, Huston wrote check number 1051 from the Blome Research LLC account, Bluevine x6214, to "Mid-land" in the amount of $37,000 with a memo listing "Stateline Fab."

76. On or about April 15, 2025, Huston wrote check number 225 in the amount of $10,000, payable to Brad Bowman with a memo of "concrete shop" from US Bank x9995.

77. On or about April 22, 2025, Huston wrote check number 269 in the amount of $250,000, payable to Stateline Welding with a memo of "Account Setup" from US Bank x9995.

78. On or about April 22, 2025, Crider purchased Arvest Bank cashier's check 7530011711 in the amount of $18,950.62 payable to Grand River Abstract reference "Stateline Fab Land" using funds drawn from Arvest Bank x3253.

79. On or about April 23, 2025, Huston purchased US Bank cashier's check number 8227510108 made payable to Grand River Abstract in the amount of $18,950.62 using funds drawn from US Bank x9995. This money was applied to the purchase of the property.

80. On or about April 24, 2025, Crider wired $168,000 from Arvest Bank account ending x3253 to Huston's US Bank x9995. Referenced in details of this wire transfer was "Fab Shop Bank Account."

81. On or about April 25, 2025, Huston wrote check number 274 in the amount of $22,978.40, payable to Bailey & Hubert with a memo of "Shop Deposit" from US Bank x9995.

82. On or about April 28, 2025, Huston wrote check number 275 in the amount of $24,313.42, payable to Foundation Recovery Systems with a memo of "Foundation Work" from US Bank x9995.

83. On or about April 29, 2025, Huston wrote check number 276 in the amount of $40,000, payable to Brad Bowman with a memo of "Concrete" from US Bank x9995.

84. On or about May 6, 2025, Huston wrote check number 280 in the amount of $9,625.91 payable to Bailey and Hubert from US Bank x9995.

85. On or about May 16, 2025, Huston wrote check number 244 in the amount of $16,000, payable to Brad Bowman with a memo of "labor" from US Bank x9995.

86. On or about September 9, 2025, Huston wrote check number 252 in the amount of $50,000, payable to Stateline Welding and Fab from US Bank x9995.

87. On or about November 24, 2025, Huston wrote check number 292 in the amount of $32,730, payable to Brad Bowman with a memo of "Labor Driveway approachs" from his US Bank account ending x9995.

19

<h2 style="text-align:center"><strong><u>CLAIM FOR RELIEF</u></strong></h2>

<h2 style="text-align:center"><strong><u>FIRST CLAIM FOR RELIEF</u></strong></h2>

88.     The Plaintiff repeats and incorporates by reference the paragraphs above.

89.     By the foregoing and other acts, the Defendant Properties were involved in transactions or attempted transactions, in violation of 18 U.S.C. §§ 1956 and/or 1957, or are property traceable to such property, and therefore, are forfeitable to the United States, pursuant to 18 U.S.C. § 981(a)(1)(A).

<h2 style="text-align:center"><strong><u>SECOND CLAIM FOR RELIEF</u></strong></h2>

90.     The Plaintiff repeats and incorporates by reference paragraphs 1 through 62.

91.     By the foregoing and other acts, the Defendant Properties constitute, or were derived from, proceeds traceable to violations of 18 U.S.C. § 1314, that is, mail fraud, and therefore are forfeitable to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C).

<h2 style="text-align:center"><strong><u>THIRD CLAIM FOR RELIEF</u></strong></h2>

92.     The Plaintiff repeats and incorporates by reference paragraphs 1 through 62.

93.     By the foregoing and other acts, the Defendant Properties constitute, or were derived from, proceeds traceable to violations of 18 U.S.C. § 1343, that is, wire fraud, and therefore are forfeitable to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C).

20

WHEREFORE the United States prays that the Defendant Properties be forfeited to the United States, that the plaintiff be awarded its costs and disbursements in this action, and for such other and further relief as the Court deems proper and just.

Respectfully submitted,

**R. MATTHEW PRICE**
United States Attorney

By:  */s/ Anthony M. Brown*
Anthony M. Brown
Assistant United States Attorney
Missouri Bar No. 62504
901 East St. Louis Street #500
Springfield, Missouri 65806
Telephone: (417) 831-4406
E-Mail: Anthony.Brown2@usdoj.gov

21

## **VERIFICATION**

I, Postal Inspector James A. Dye, hereby verify and declare under penalty of perjury that I am a Postal Inspector with the United States Postal Inspection Service, that I have read the foregoing Verified Complaint <u>in</u> <u>Rem</u> and know the contents thereof, and that the factual matters contained in paragraphs <u>17</u> through <u>87</u> of the Verified Complaint are true to my own knowledge, except that those matters herein stated to be alleged on information and belief and as to those matters I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Postal Inspector of the United States Postal Inspection Service.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.


Dated June 18, 2026

/s/ James A. Dye
James A. Dye
Postal Inspector
U.S. Postal Inspection Service

22